```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


JANET JIMENEZ, on behalf of      *  Case No. 15-CV-05790 (FB)
 herself and all others          *
 similarly situated,             *
                                 *
                Plaintiff,        *  Brooklyn, New York
                                 *  February 17, 2016
      v.                         *
                                 *
CONCEPTS OF INDEPENDENCE, INC.,  *
                                 *
                Defendant.        *
                                 *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


        TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
             BEFORE THE HONORABLE JAMES ORENSTEIN
                UNITED STATES MAGISTRATE JUDGE

   APPEARANCES:

   For the Plaintiff:       JEFFREY G. SMITH, ESQ.
                            ROBERT ABRAMS, ESQ.
                            CORREY ANN KAMIN, ESQ.
                            Wolf Haldenstein Adler Freeman &
                             Herz, LLP
                            270 Madison Avenue
                            New York, NY  10016


   For the Defendants:      HERMES FERNANDEZ, ESQ.
                            DAVID E. PRAGER, ESQ.
                            Bond, Schoeneck & King, PLLC
                            22 Corporate Woods Blvd., Suite 501
                            Albany, NY  12211




   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
```

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 10:06 a.m.)

2              THE CLERK:  Civil cause for initial conference,

3      Jimenez versus Concepts of Independence, Inc., Case Number

4      15-Civil-5790.

5              Counsels, please state your name for the record,

6      beginning with plaintiff.

7              MR. SMITH:  Jeff Smith, Your Honor, from Wolf

8      Haldenstein Adler Freeman & Herz.

9              THE COURT:  Good morning.

10             MR. SMITH:  Good morning.

11             MR. ABRAMS:  Good morning, Your Honor.  Robert

12     Abrams, also from Wolf Haldenstein.

13             THE COURT:  Good morning.

14             MS. KAMIN:  Good morning, Your Honor.  Correy Kamin

15     from Wolf Haldenstein.

16             THE COURT:  Good morning.

17             MR. FERNANDES:  Hermes Fernandes from Bond,

18     Schoeneck & King on behalf of Concepts of Independence.

19             THE COURT:  Good morning.

20             MR. PRAGER:  David Prager, from Bond, Schoeneck &

21     King, also on behalf of Concepts of Independence.

22             THE COURT:  Good morning.  All right, folks.

23             So I've read the complaint.  I've read the various

24     letters to me, including one, frankly, somewhat belatedly

25     filed, late yesterday, seeking a stay of discovery.

3

1            And going to ask plaintiff's counsel -- I don't know

2      who wants to speak for the plaintiffs, but -- plaintiff -- but

3      have you seen that motion?

4            (No audible response.)

5            THE COURT:  You have?  Okay.  Good.

6            All right.  So before we get to that issue, just

7      walk me through a little bit more factually the plaintiff's

8      work and the defendant's practices.

9            And, again, I don't know who wants to speak on

10     behalf of the plaintiff.  But Mr. Jimenez -- is it Mr. or Ms?

11           MR. SMITH:  Ms.

12           THE COURT:  Ms.  Okay.

13           MR. SMITH:  Yes.

14           THE COURT:  Ms. Jimenez worked for approximately

15     five weeks for the defendant?

16           MR. SMITH:  Five.  Or in my mind, I have six, but it

17     could be five, Your Honor.

18           THE COURT:  Okay.  Tell me about the hours and the

19     schedule, you know, the schedule of the wages rather.

20           MR. SMITH:  She worked 24-hour shifts, sometimes as

21     many as five in a week is my understanding.  She was paid for

22     12 hours of each 24-hour shift, which was and may still be

23     industry standard.  But the rules have changed over the last

24     few years.

25           THE COURT:  I know.

4

1          MR. SMITH:  She was paid I —— Your Honor, I may be

2     corrected on this, but I believe she was paid about $10 an

3     hour for the 12 hours ——

4          THE COURT:  How were the shifts ——

5          MR. SMITH:  —— which amounts to $5 an hour for the

6     24.

7          THE COURT:  Yeah.  How were the shifts determined?

8     And also was it always for the same client or someone —— a

9     different person each time?

10          MR. SMITH:  In this case, I believe for the five,

11     four or five or six weeks, she worked for the same client, but

12     I honestly am not sure, Your Honor.

13          THE COURT:  Okay.

14          MR. SMITH:  I think she worked for the same client.

15          THE COURT:  Okay.  And within the 24-hour shifts,

16     what direction did she have about when she was on call?  You

17     know, what were the activities actually like ——

18          MR. SMITH:  She was ——

19          THE COURT:  —— because I know that could be an

20     issue?

21          MR. SMITH:  She was to stay there for 24 hours and

22     render what —— working for 12 of them, and rendering whatever

23     assistance was necessary the other 12.

24          THE COURT:  Did she ——

25          MR. SMITH:  She didn't ——

5

1          THE COURT:  -- did you get --

2          MR. SMITH:  She was not a live-in, Your Honor.  I

3    want to make that clear.  She didn't --

4          THE COURT:  Right.

5          MR. SMITH:  She didn't live there.  It was a 24-hour

6    shift.

7          THE COURT:  Right.  And during the 24 hours, did she

8    have a sleep period regularly?

9          MR. SMITH:  I'm sure she slept.  I haven't actually

10   asked her that question, but I'm sure slept part of the time.

11         THE COURT:  Okay.  Because I know that the amount of

12   time that she gets uninterrupted sleep is an issue under

13   the -- under the rule.

14         MR. SMITH:  I don't know that it is an issue under

15   the state rule, Your Honor.  I think it may be an issue under

16   the federal rule, but I don't believe it's an issue under the

17   state.

18         THE COURT:  But you've asserted a federal claim,

19   right?

20         MR. SMITH:  And we've also asserted state claims.

21         THE COURT:  Okay.  Is there some problem with me

22   asking the question about a rule that does apply to a claim

23   that you've -- that you've asserted?

24         MR. SMITH:  Not at all.  Not at all, Your Honor.

25         THE COURT:  Okay.  So you haven't asked the question

1    that is pertinent to one of the claims that you bring in this

2    court, correct?

3            MR. SMITH:  I'm getting a little lost.  I haven't

4    answered it?  I didn't hear what you said.

5            THE COURT:  I asked you a question about her sleep

6    schedule.

7            MR. SMITH:  Yes.

8            THE COURT:  And you said, oh, well, that's not an

9    issue and I haven't asked my client.

10           MR. SMITH:  Well, I'm not saying it's not an issue,

11   Your Honor.  I'm saying I don't know what her sleep schedule

12   was.  I'm sure she slept part of that time.

13           THE COURT:  Yeah.  But you sort of brushed aside the

14   question saying it's not an issue only to have me establish,

15   after some back and forth, that it is an issue under one of

16   the claims you assert.

17           MR. SMITH:  I apologize, Your Honor.  I apologize.

18           THE COURT:  I'm not offended.  But I want --

19           MR. SMITH:  I wasn't trying to brush you aside.

20           THE COURT:  I'm trying to understand.  It is an

21   issue under a claim you're asserting, but you didn't want to

22   find out from your client what the answer is.

23           MR. SMITH:  I don't know the answer, Your Honor.

24           THE COURT:  Do any of your colleagues know.  Any --

25           MR. ABRAMS:  Your Honor, as I understand it, the --

7

1     Ms. Jimenez, our client, was a woman who is 97 years old, has

2     serious problems both mental and physical, and as I understand

3     it she was always on call throughout the night, so that she

4     may have gotten some sleep, but that there was no regular

5     sleep at all.  It just simply wouldn't have been possible.

6            For example -- and in the cases -- in this case for

7     example, with this particular consumer, she didn't even

8     recognize her son when he would come to visit her.  She

9     wandered at night.  She slept irregularly.

10           So it would appear that there was no block of time

11    that Ms. Jimenez could count on.  And as I understand it, in

12    most of these cases, the consumers are individuals like this

13    one.

14                 THE COURT:  Try to stick to this case.  Just get --

15                 MR. ABRAMS:  Okay.

16                 THE COURT:  -- to get may --

17                 MR. ABRAMS:  Sure.

18                 THE COURT:  -- get my legs underneath factually.

19    Okay.

20           What was the -- how was the -- how were the wages

21    paid?  Cash, check, and by whom?  Anyone?

22                 MR. SMITH:  Paid in check, Your Honor.

23                 MS. KAMIN:  They were paid by check from Concepts of

24    Independence.

25                 THE COURT:  From Concepts of Independence.  Okay.

8

1    And was there a wage statement attached to it that reflected

2    hours, or how did -- how did that work?

3                    MS. KAMIN:  There was a brief statement, yes, of the

4    hours she worked, but it didn't reflect the complete 24 hour -

5    - hour period.  It just reflected the hours she was paid for,

6    not necessarily the hours she worked.

7                    THE COURT:  Okay.  And how are you defining the

8    hours she worked?  Based on when she was present or some other

9    standard?

10                   MS. KAMIN:  Based on when she was present and on

11   call in the client's home.

12                   THE COURT:  Okay.  All right.  Why was Ms. Jimenez's

13   tenure so brief?  Any understanding of that?

14                   MR. ABRAMS:  Your Honor, my under --

15                   THE COURT:  I don't think it matters.  I'm just

16   curious.

17                   MR. ABRAMS:  My understanding was that she that she

18   was working an awful lot of hours for very little money.

19   That's my understanding.

20                   THE COURT:  What she doing now?

21                   MR. ABRAMS:  I'm not sure, Your Honor.

22                   THE COURT:  Okay.

23                   MR. ABRAMS:  I don't believe she's doing this kind

24   of work.

25                   THE COURT:  Okay.  Yeah.  I'm just -- there's a real

1    client here, right --

2         MR. ABRAMS:  Yes.

3         THE COURT:  -- that I take it you're trying to

4    represent?

5         MR. ABRAMS:  Correct.  That's correct, Your Honor.

6         THE COURT:  All right.  And Mr. Fernandes or Mr.

7    Prager, from your perspective, where's the factual

8    disagreement?  I understand there's some legal issues that you

9    want to raise, but factually, what, if anything, is the

10   disagreement?

11        MR. FERNANDES:  Your Honor, first if I could, I

12   apologize.  It wasn't our intention to actually file the

13   motion.  It was our intention that the letter would explain

14   the positions we were taking in the scheduling plan.

15        THE COURT:  Oh, so you're not seeking a stay?

16        MR. FERNANDES:  Well, I think in effect we are

17   because of what our position is.

18        THE COURT:  I think so too.

19        MR. SMITH:  Yes.

20        THE COURT:  And I'd just as soon you not -- tell me

21   you're not doing something when you are.  You're obviously

22   seeking a stay.

23        MR. FERNANDES:  All right.  We are, Your Honor.  I

24   would have filed it as a proper motion, but we do want a stay,

25   yes.  To be very clear, we do want a stay.  And that's what

1        our position was in the -- in these papers.

2                THE COURT:  And, you know, is there a difference

3        between asking for a stay and respectfully requesting that

4        discovery commence after the resolution of defendant's

5        intended motion to dismiss?

6                MR. FERNANDES:  There's not.

7                THE COURT:  Okay.

8                MR. FERNANDES:  There's not.  Okay.

9                THE COURT:  All right.  So, you know, less than --

10       less than a day before the planned conference, after you've

11       been supposed to confer on a jointly proposed schedule, that's

12       when you put in something that is in effect a motion but

13       you're not calling it that.

14               In the future, let's try and do things in a more

15       orderly way.  Call things what they are and do it in a way so

16       that there's time to respond before we get to court.  All

17       right.

18               MR. FERNANDES:  Yes, Your Honor.

19               THE COURT:  But let's see if we can address the

20       question that I was asking.  Are there any factual areas of

21       disagreement?

22               MR. FERNANDES:  At this point, there are factual

23       areas of disagreement.  They may be different than Your Honor

24       was asking about.  Some of the issues we simply don't know

25       about and let me explain why.

1            Concepts of Independence operates as a fiscal

2      intermediary.  That's --

3            THE COURT:  You told me that.  Look, come on.  I'm

4      such a simple guy that I get lost when I ask a question and a

5      lawyer starts answering a different one.  Then I don't -- I

6      don't follow the answers to either one.

7            MR. FERNANDES:  Okay.

8            THE COURT:  So let's start with the question I

9      asked.

10            MR. FERNANDES:  All right.  There are factual --

11            THE COURT:  Yeah.  What --

12            MR. FERNANDES:  Yes, there are factual disputes.

13      The first dispute goes to the nature of Concepts of

14      Independence.  Concepts of Independence doesn't do -- Your

15      Honor, I'm sorry, but I have to explain this.  Concepts of

16      Independence --

17            THE COURT:  You don't have to, but you're going to,

18      so -- and I can't stop you so say what you're going to say.

19      Go ahead.

20            MR. FERNANDES:  Concepts of Independence doesn't do

21      the scheduling.  Concepts of Independence doesn't do the

22      hiring.  Concepts of Independence doesn't have a role in terms

23      of what services Ms. Jimenez provided as a personal assistant.

24            So we write -- today we don't know -- apart from the

25      time she -- that Ms. Jimenez submitted, we don't know what

1   services she provided during the scheduled -- during her

2   scheduled hours.

3           THE COURT:  You cut the checks to her, yes?

4           MR. FERNANDES:  Yeah.  That's right.

5           THE COURT:  So how do you determine what amount to

6   put on the check?

7           MR. FERNANDES:  The amount is determined in this

8   case bythe fact that -- what was authorized by either the City

9   of New York or by a managed care provider -  I'm not sure

10  which did it in this circumstance.  I believe it was the

11  managed care provider authorized live-in services for Ms.

12  Jimenez [sic].  And since she was -- since she was receiving

13  live-in services, Ms. Jimenez would have been paid according

14  to the live-in standard that's set with the contract with the

15  managed care provider.

16          THE COURT:  You're paying the worker as opposed to

17  the client?

18          MR. FERNANDES:  That's right.

19          THE COURT:  Ms. Jimenez was authorized to receive

20  something?

21          MR. FERNANDES:  Ms. Jimenez was authorized.  She was

22  a Medicaid beneficiary.  She was eligible --

23          THE COURT:  Ms. Jimenez?

24          MR. FERNANDES:  I'm sorry.  Ms. Isquith.  Yes.  I'm

25  sorry.  Ms. Isquith.

1          THE COURT:  The client.

2          MR. FERNANDES:  Isquith, yes.  No, not the client.

3     Ms. Isquith was -- I'm sorry.  Ms. Isquith was authorized to

4     receive services.

5          THE COURT:  Ms. Isquith is the client, not the

6     plaintiff, right?

7          MR. FERNANDES:  Yeah.  The consumer we call them,

8     yes.  I'm sorry.

9          THE COURT:  Okay.  The consumer if that's what you

10    want to call it?

11         MR. FERNANDES:  Yes.

12         THE COURT:  Okay.

13         MR. FERNANDES:  So Ms. Isquith was authorized to

14    receive services.

15         THE COURT:  Right.  So how does that determine what

16    you pay Ms. Jimenez?  Because maybe she didn't provide any

17    services to Ms. Isquith.  How do you determine what to pay the

18    person providing the service?

19         MR. FERNANDES:  Because in this case Ms. Isquith was

20    authorized by the entity that authorizes home -- consumer

21    directed services for live-in services.  And by virtue of

22    that, when Ms. Isquith's personal assistant presents a time

23    sheet that says I worked these shifts, and her time sheet

24    showed she worked 24-hour shifts, she then was paid the live-

25    in rate.

14

1          THE COURT:  Right.  So the relationship is not with

2     the consumer, right?  Who selects Ms. Jimenez?

3          MR. FERNANDES:  Actually in this case, I -- actually

4     in this case, my understanding is that Ms. Isquith lacked

5     capacity --

6          THE COURT:  It sounds like that.

7          MR. FERNANDES:  -- to direct her own care.

8          In that case, the regulations require that she have

9     an individual designated as a personal representative, which

10    my understanding is that she did, and that was a relative of

11    hers.  So that designated representative selected --

12         THE COURT:  But how do you get involved?  The

13    representative goes out and finds Ms. Jimenez?

14         MR. FERNANDES:  Yes.

15         THE COURT:  And Ms. Jimenez does the work?

16         MR. FERNANDES:  That's right.

17         So how Concepts gets involved is, once the

18    individual is designated as eligible for consumer directIVE --

19    and in this case, the personal representative says I want my

20    relative to receive consumer directed services -- they then

21    have a choice of fiscal intermediaries.

22         In this chase, they -- in this case, they chose

23    Concepts of Independence to be their fiscal intermediary.  And

24    as fiscal intermediary, Concepts handles payment, looks to see

25    that the person only submits hours for which they're

15

 1      authorized, submits them on the basis of those payroll

 2      records, submits to the state Medicaid program for payment.

 3              THE COURT:  And you have no role in selecting who

 4      performs these services?

 5              MR. FERNANDES:  None.

 6              THE COURT:  None.

 7              MR. FERNANDES:  The --

 8              THE COURT:  Or the hours?

 9              MR. FERNANDES:  Or the hours.

10              THE COURT:  All right.  Is there disagreement on

11      that on the plaintiff's side?

12              MR. SMITH:  There is, Your Honor.  I think that they

13      have to qualify the person even though it's consumer directed.

14              THE COURT:  Uh-huh.

15              MR. SMITH:  They do have to qualify the person.

16      They can't just pay to grandma for instance.

17              THE COURT:  Okay.

18              MR. SMITH:  And --

19              THE COURT:  Who's setting the hours?

20              MR. SMITH:  I do not know the answer to that, Your

21      Honor.

22              THE COURT:  Does anybody on the plaintiff's side

23      know that?

24              MR. ABRAMS:  The hours -- the hours, Your Honor, are

25      approved --

1          THE COURT:  Yes.  But somebody has to figure out --

2          MR. ABRAMS:  -- and then the question of how to pay

3      the persons --

4          THE COURT:  Look, Ms. Jimenez didn't come up with

5      the idea of spending 24 hours on certain days and not coming

6      at all on others?

7          MR. ABRAMS:  No.

8          THE COURT:  Somebody did.

9          MR. ABRAMS:  She was just assigned to that by them.

10         THE COURT:  You're saying it was assigned?

11         MR. ABRAMS:  That's my understanding.

12         MS. KAMIN:  Your Honor, I believe Ms. Jimenez and

13     her client's son in this case agreed upon the hours together.

14         THE COURT:  So did the defendant have any role in

15     that?

16         MS. KAMIN:  I don't believe so.

17         THE COURT:  Okay.  Now look, it's one thing to have

18     discovery as between the parties, but right now I've got two

19     different lawyers for the plaintiff telling me factually two

20     different things.  And I don't anticipate we're going to have

21     discovery as between the two plaintiff's counsel.

22         Can somebody tell me which of the two things I've

23     just heard is the plaintiff's position?

24         MS. KAMIN:  From speaking to our client, I believe

25     that her hours were set by agreement with her client.

1          THE COURT:   Okay.   Is there any employment agreement

2     here?

3          MS. KAMIN:   There is what seems to be kind of an

4     informal agreement.   It's called A Managed Care Enrollment

5     Memo that was provided by Concepts to Ms. Jimenez when she

6     started working for them.

7          THE COURT:   Do you happen to have it?

8          MS. KAMIN:   I don't believe I do, Your Honor.

9          THE COURT:   Do you?

10         MR. FERNANDEZ:   I did not bring that with us.   But

11    she's right, that that is provided.   That's provided to the

12    consumer and it's provided to the personal assistant.

13         THE COURT:   How does -- how does Concept get its

14    cut?   In other words, it's making some money out of this.   How

15    does it do that?

16         MR. FERNANDES:   Yes.   Concepts does this in one of

17    two ways.   It is a not-for-profit, but it either has a

18    contract directly if it's in the City of New York with the

19    Human Resources Administration or it now has a -- or it has

20    contracts now with what are called managed long-term care

21    entities who are now stepping into the role that HRA formerly

22    provided.

23         And so now with the managed long-term care entities,

24    they have to negotiate a rate which is actually the managed

25    long-term care entities say this is the rate we'll pay and

1      Concepts either says yes or no.

2               THE COURT:  And does Concepts get something beyond

3      that rate -- not beyond that --

4               MR. FERNANDES:  That's it.  That's it.

5               THE COURT:  So you get -- you get money from HRA in

6      a city case?

7               MR. FERNANDES:  They're all city cases, but now the

8      managed care entities are coming in.  So let's just say for

9      sake of argument $18 an hour may be what is paid by the

10     managed care entity.  And the numbers will be around that.

11     Depends on which entity.  So $18 an hour.  From that, Concepts

12     has to pay for its administrative expenses.

13              THE COURT:  What do you administer?  I mean, you

14     know, this is I'm --

15              MR. FERNANDES:  Sure.

16              THE COURT:  -- I'm trying to understand, if you're

17     not an employer, what you're doing that gets you the

18     difference between the 18 you get from whoever --

19              MR. FERNANDES:  Right.

20              THE COURT:  -- and the -- it sounds like 10 you're

21     paying to Jimenez.

22              MR. FERNANDES:  Well, actually in this case -- I

23     stopped too soon -- because in this case, what they get is a

24     flat amount on the live-in rate as well.  So they get --

25     they'll get a rate that says 18 times 13 and that's what they

19

1  get.  So --

2          THE COURT:  All right.  But it breaks down --

3          MR. FERNANDES:  Right.  So here's what they get.

4          THE COURT:  -- in theory to an hourly rate that is

5  80 percent greater than what you're paying out to the worker.

6  What is Concepts doing for that that doesn't make it an

7  employer?

8          MR. FERNANDES:  Sure.  What Concepts does is it acts

9  in two different ways.  It acts as the interaction with the

10 Medicaid program.  So it receives the enrollment of the

11 individual or the beneficiary says I want the consumer

12 directed services.  Concepts has to essentially explain the

13 program to the consumer participants or their designated

14 representative.

15          There are by regulation certain -- very, very few

16 standards, but certain standards that the personal assistant

17 has to meet.  A personal assistant can't be a spouse.  A

18 personal assistant can't be on the Medicaid exclusion list.  A

19 personal assistant has to have a health assessment and have

20 received and proved that they have had measles or they've had

21 measles inoculations and things like that.

22          And then after that, what they do is they receive

23 from the consumers the time sheets that have been provided by

24 the -- by the consumer, their personal assistant, showing what

25 hours they worked.  They have to check those to be sure that

1     there is some indicia of authenticity.

2          They check those against the authorized hours.  They

3     submit those to the managed care entity or to the Medicaid

4     program directly for payment.  That turns around.

5          They also -- besides the dollar amount of the

6     earnings for the consumers, there's also benefits as well.

7     The gap is not 60 percent.  It's much, much smaller.  This

8     program's become very popular because it's less expensive than

9     regular personal care services.

10          THE COURT:  Are any taxes or benefits withheld from

11     the paycheck?

12          MR. FERNANDES:  Yes.  They're responsible for doing

13     those things.  So they handle all the withholding issues, pay,

14     benefits, Workers Comp, those types of things.

15          THE COURT:  Okay.  And let me just ask the

16     plaintiff's counsel again -- whoever knows this just weigh in

17     -- in terms of hiring and firing, is there any dispute that

18     the -- well, you've already told me that the client, the

19     consumer's representative selected Ms. Jimenez.

20          To whom was Ms. Jimenez's resignation communicated?

21     To whom was the resignation communicated?  In other words,

22     when Ms. Jimenez decided she no longer wanted to do it, to

23     whom did she give notice?

24          MS. KAMIN:  I have not asked her about that

25     directly, but I would assume she gave notice to both Concepts

1    of Independence and to the client for whom she worked.

2              THE COURT:  And in terms of setting the hours, who

3    did that?  That was -- those --

4              MS. KAMIN:  She set them by agreement with her

5    client.

6              THE COURT:  With the client.  Okay.  So what did

7    Concepts do that satisfies the economic reality test of an

8    employer?

9              MR. SMITH:  Your Honor, as counsel just said, they

10   screen her for the job to make sure she's qualified.

11             THE COURT:  But they don't have hiring and firing

12   authority, right?  They can neither hire her against the

13   client's wishes nor fire her against the client's wishes?

14             MR. SMITH:  I don't know the answer to that, Your

15   Honor.  I believe it's shared.

16             If she was doing something, for instance, that was a

17   violation of the Medicaid rules --

18             THE COURT:  Of course.

19             MR. SMITH:  -- they can --

20             THE COURT:  If they're --

21             MR. SMITH:  -- they can fire --

22             THE COURT:  If she's ineligible, she can't get paid

23   for doing this.  But --

24             MR. SMITH:  Or if she's doing something in leaving

25   in the middle of the night for instance, they could fire her

22

1      if they found that out.  So I believe it's shared, but --

2                  THE COURT:  You disagree with that?

3                  MR. FERNANDEZ:  We cannot.  No authority whatsoever.

4                  THE COURT:  What's your basis for saying that?

5                  MR. SMITH:  My basis for saying that is my general

6      knowledge of the field.  I have a relative who works in the

7      field.

8                  THE COURT:  All right.  Do you have any --

9                  MR. SMITH:  And surprise and --

10                 THE COURT:  -- information based on the facts of

11     this case?

12                 MR. SMITH:  I don't.  I haven't seen --

13                 THE COURT:  And if -- because if you're doing this,

14     it sounds --

15                 MR. SMITH:  I haven't seen the contract yet.

16                 THE COURT:  It does sound -- it's -- you're Mr. --

17                 MR. SMITH:  Smith.

18                 THE COURT:  Smith.  It sounds like if you're saying

19     I know this based on things I've heard from other people who

20     weren't parties to the case, that sounds more like a witness.

21     And if you want to be a witness, that's fine, but.

22                 MR. SMITH:  Fair enough.  Fair enough, Your Honor.

23     I don't know it from documents.

24                 THE COURT:  I just want to know if there's any facts

25     based on information in this case.

23

```
 1              MR. SMITH:  I don't have documents on it, no.

 2              THE COURT:  Or statements from the client?

 3              MR. SMITH:  I do not have a statement from the

 4      client on it.

 5              THE COURT:  Okay.  All right.  All right.  Well,

 6      look, it helps me get oriented in the case.  I don't know --

 7      and we're clearly not trying the case or resolving the motion

 8      to dismiss here.

 9              Let's talk about discovery and the issue of the

10      stay.  I've read the defendant's letter, as I know you guys

11      have on the plaintiff's side.

12              It sounds like there are a number of issues here

13      that are going to be clarified by the motion practice that may

14      well have a very large impact on how discovery proceeds.  Why

15      isn't it in everybody's interest to have a stay?

16              MR. SMITH:  Your Honor, many of the things that will

17      be argued on the motion to dismiss and in our motion for class

18      -- not class certification -- collective certification we need

19      some discovery on.  We need to get some discovery from them,

20      for instance, to find out about this hiring and firing

21      authority.  We need to see what their agreement with Ms.

22      Jimenez is.  And we need to see what their agreement with our

23      client is.  I don't have a copy of that.

24              THE COURT:  But don't you have an obligation to --

25              MR. SMITH:  We need to see what their agreements are
```

1    with the state --

2              THE COURT:  Well, what the --

3              MR. SMITH:  -- entities that pay them.

4              THE COURT:  But this is -- this is a motion that

5    tests the allegations.

6              MR. SMITH:  Yes.

7              THE COURT:  And allegations aren't going to be based

8    on here's what I think may apply in this case based on what a

9    relative who works in the field tells me.

10             It has to be based on what your client tells you and

11   that you've, you know, alleged in good faith based on that.

12             And, you know, if we take out what you understand

13   based on what you've heard from a relative in the field, I'm

14   not sure that you've necessarily alleged something that

15   discloses an employment relationship.

16             MR. SMITH:  I disagree, Your Honor.  I think we

17   have.

18             THE COURT:  Yeah.

19             MR. SMITH:  We have alleged sufficient facts about

20   the employment, about who paid.  He's just said some of that.

21             THE COURT:  Yeah.

22             MR. SMITH:  About who pays.  About what they have to

23   do before they can reach that stage.

24             THE COURT:  Okay.

25             MR. SMITH:  I believe we have alleged sufficient

1    evidence here --

2            THE COURT:  Oh, okay.  So you're going to prevail on

3    the motion to desist?

4            MR. SMITH:  -- to make a serious question.

5            THE COURT:  Yeah.

6            MR. SMITH:  And I think we prevail.

7            THE COURT:  Okay.

8            MR. SMITH:  So I don't think we're at a stage

9    here --

10           THE COURT:  So you don't need discovery.  You don't

11   need discovery to litigate the motion to dismiss?

12           MR. SMITH:  We don't need discovery for that.  I

13   don't think we need discovery to show that their motion to

14   dismiss is not the slam-dunk that they think it is.

15           THE COURT:  Right.  Okay.

16           MR. SMITH:  I think that their motion -- and since

17   their motion to dismiss is not a slam-dunk, I think discovery

18   should go ahead.

19           THE COURT:  Yeah.

20           MR. SMITH:  There are areas that we want discovery

21   on.  They're fairly discreet.  But there are areas in our

22   first wave of discovery that we want to take discovery on.

23           THE COURT:  Well, what -- what discovery is directed

24   purely to the motion to dismiss?

25           MR. SMITH:  I don't know that any of it's directed

26

1      purely to the motion to dismiss, Your Honor.  It's directed

2      towards the claims in the case.

3                THE COURT:  What --

4                MR. SMITH:  I don't think the claims in the case,

5      and particularly the state claims which they haven't even

6      really challenged, I don't believe -- there they have a cake

7      and eat it too kind of a thing where they say they're not an

8      employer, but yet they've qualified for an employer's

9      exemption in the state which I don't think they have.

10               THE COURT:  Okay.

11               MR. SMITH:  And I think that those are fair grounds

12     for us to start discovery on now rather than wait.

13               THE COURT:  Okay.  Look, my usual take on motions to

14     stay discovery pending a dismissal motion is that there's

15     almost always something that can and should go forward pending

16     a motion to dismiss because there's some dispute that's going

17     to be played out in this court most likely.  You know, motions

18     to dismiss are rarely successful.

19               But it strikes me that there are here some really

20     significant threshold issues that may shape discovery and

21     that's going to be a lot more efficient to await the outcome

22     of a motion to dismiss, and not prejudicial to Ms. Jimenez.

23               So I'm going to grant the motion with this caveat.

24     To the extent that there are very targeted discovery requests

25     going to the nature of the employment relationship that's

1   alleged here -- in other words, is there, you know, a contract

2   between Jimenez and Concepts, something about, you know, was

3   there anything that sets -- that Concepts does to set the

4   schedule or the conditions of employment, I think that's fair

5   game and I think it will --

6           MR. SMITH:  Your Honor, I would ask that you

7   consider also in that the contracts they had with the consumer

8   here and the contracts they have with the agencies --

9           THE COURT:  I'm not going to prescribe everything.

10  I'm going to ask you to confer about very, and I mean very,

11  limited discovery as to the employment relationship between

12  Jimenez and Concepts.

13          But I will tell you, Mr. Smith, based on what I've

14  heard today, I think there's a very good reason to hold off

15  anything that's particularly burdensome until we have a much

16  better idea based on the motion practice where this case is

17  going.

18          So my sole goal here is to allow the limited

19  discovery, if any -- and I want to emphasize this because it

20  is a motion to dismiss based on the pleadings -- if any, that

21  you guys need to fairly litigate a dismissal motion.

22          Now you've told me you're prepared to litigate it

23  without discovery so maybe that there's nothing.  But I don't

24  want to shut off -- shut off entirely without having you guys

25  sit down and talk about something that you might be able to

1    work out consensually about, you know, very basic pieces of

2    information about the case like, you know, an employment

3    contract, anything that sets schedules and so on.

4            But I leave that to you guys to work out in the

5    first instance.  And if there's a dispute, you bring that to

6    me.

7            In light of that decision, I'm not going to schedule

8    a further appearance before me and I'll wait to see what

9    happens with Judge Block and the resolution of the motions.

10           All right.  Anything else for today, folks?

11           MR. FERNANDES:  Thank you.

12           THE COURT:  Okay.  Thank you very much.  Have a good

13   day.

14       (Proceedings concluded at 10:35 a.m.)

15       I, CHRISTINE FIORE, Certified Electronic Reporter and

16   Transcriber, certify that the foregoing is a correct

17   transcript from the official electronic sound recording of the

18   proceedings in the above-entitled matter.

19

20   *Christine Fiore*

21   _____          September 18, 2017

22   Christine Fiore, CERT-410

23